[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this presentment, the Statewide Grievance Committee seeks the disbarment of the respondent based on his actions in conjunction with those of his former partner/employer, John A. Carrozzella, Esq., which resulted in the loss of in excess of twelve million dollars by clients and former clients of the respondent's law firm. On May 10, 1996, based on his pleas of guilty to conspiracy to Commit Mail Fraud, 18 U.S.C. § 371; Mail Fraud, 18 U.S.C. § 1341; and Misappropriation of Funds of Fiduciary 36 U.S.C. § 6101 in the United States District Court, he received a sentence of 24 months incarceration[1] plus 3 years probation, community service, restitution and other conditions. The petitioner brought this action immediately following the respondent's conviction. Pursuant to an agreement of the parties, this court, Hodgson, J., placed the respondent on interim suspension pending the completion of his term of incarceration.
The respondent has been released from incarceration and is employed in a non-legal position. The petitioner now seeks the respondent's disbarment.
The factual basis for the criminal convictions that have resulted in these proceedings are recited in some detail in the plea agreement entered into between the petitioner and the United States Government:
 1. From at least in or about 1990 to in or about May, 1995, in the District of Connecticut, the defendant, Thomas J. Richardson aided and abetted John A. Carrozzella in executing a scheme and artifice to defraud individuals who entrusted money to them for investment purposes and to obtain money and property from the individuals by means of CT Page 5288 false and fraudulent pretenses, representations and promises, as more fully set forth below. In furtherance of and as part of the scheme to defraud, the defendant used the United States mail or caused the mails to be use.
 2. At all times relevant to the scheme and artifice to defraud, the defendant worked at a law practice located at 35 South Main Street, Wallingford, Connecticut.
 3. From on or about 1979 to on or about January, 1990, the law practice was a partnership owned by John A. Carrozzella and the defendant Thomas J. Richardson. The defendant was removed as a partner in approximately January, 1990, and John A. Carrozzella operated the practices as a sole proprietorship from approximately January, 1990 to on or about June 30, 1995. The defendant Thomas J. Richardson worked as an associated on a commission basis from January, 1990 to on or about June 30, 1995. Over the years, the firm had several names including Carrozzella Richardson and, most recently, Carrozzella, Richardson, Morytko Carrozzella.
 4. At all times relevant to the scheme and artifice to defraud, John A. Carrozzella maintained control over the law firm's books and records, including but not limited to all financial records.
 5. At all times relevant to and in order to carry out the scheme to defraud, John A. Carrozzella maintained control over the law firm's savings accounts which from at least as early as 1987 to in or about February, 1995 were held at American National (Lafayette American) Bank and, from in or about February, 1995 to June, 1995, at the Chase Manhattan Bank. The savings accounts were in the names of both Carrozzella and Richardson. Nearly all the money which came into the firm was deposited into the savings account. The money deposited included, but was not limited to, all money received as a result of legal work performed at the firm, i.e., settlement of lawsuits, probate matters and real estate closings.
 6. At all times relevant to and to carry out the scheme and artifice to defraud, John A. Carrozzella also maintained control over the law firm's checking accounts, which from at least as early as 1987 to in or about February, 1995 were held at the Bank of Boston. There were two checking accounts at the Bank of Boston which were captioned client account and CT Page 5289 investment account. The accounts were in the names of both Carrozzella and Richardson. In or about February, 1995, these two accounts were closed or became dormant and a single checking account, account no. 43088902 captioned "Carrozzella Richardson, Clients Fund Account," was opened at the Chase Manhattan Bank. Although a single account at the Chase Manhattan Bank, the checking account no. 43088902 was treated as two separate accounts — a clients fund account and an investment account. John A. Carrozzella maintained control over two check registers and two sets of checks relating to checking account no. 43088902.
 At the direction of John A. Carrozzella, money was transferred from the savings account to the checking accounts on an as needed basis. For example, if money was needed to cover expenses related to the properties or to make interest payments to cover expenses related to the properties or to make interest payments to clients, the money was transferred from the savings account to the investment account. If money was needed to make payments in connection with the management of a trust or conservatorship, or if money was needed for payments related to legal work such as a real estate closing or a settlement of a lawsuit, the money was transferred from the savings account to the client account.
 7. At all times relevant to and to carry out the scheme and artifice to defraud, John A. Carrozzella also maintained control over a checking account which was used as a cost account. At the direct of Carrozzella, money was transferred from the savings account to the cost account and was used primarily to pay office expenses.
 From on or about at least 1987 to in or about February, 1995, the cost account was held at the Union Trust Bank. The account was in the name of both Carrozzella and Richardson. From in or about February, 1995 to on or about June, 30, 1995, the cost account was held at the First Federal Bank, account no. 13968180, captioned "Carrozzella and Richardson Cost Account."
 8. As part of the scheme to defraud, the defendant Thomas J. Richardson advised clients to entrust money to the law firm. Richardson represented to the clients that John A. Carrozzella would handle the money for them or invest the money for them and that the money would earn a very good rate of return.
CT Page 5290
 9. As part of the scheme to defraud, the defendant Thomas J. Richardson also allowed John A. Carrozzella to use improperly money held by Thomas J. Richardson as a fiduciary or conservator for clients.
 10. In order to carry out the scheme and artifice to defraud, John A. Carrozzella invested client funds largely in real estate and stocks and bonds. Carrozzella also used client funds to cover interest payments to be made to clients and to cover expenses associated with the management of the investments.
 Beginning at least as early as 1987, the investments performed poorly and the money invested was lost or significantly reduced.
 The real estate and stocks purchased with client money were not purchased in the name of the clients but rather purchased in the defendant's name, John A. Carrozzella's name or in the name of the partnerships with which the defendant was associated.
 For example, Thomas Richardson filed a 1993 joint U.S. Individual Income Tax Return, Form 1040, and listed the following as partnerships on his Schedule E supplemental Income and Loss. The below listed real estate partnerships were investments made with John A. Carrozzella and purchased with client money:
 Carrozzella Richardson, Carrozzella Richardson, Carrozzella Richardson, 107 Harbor Island, 6-W Park Shores, TC Investments, 1805 Madison, Schooner, #313, Schooner #310, Ocean Club #1805, Spindrift Properties, 503 Caledon Shores, Bay Tree F-12 Madison 2009 202 Caledon Shores, 3-A Island Shores, Marina Bay 41, CT Page 5291 Carrozzela, Richardson Thompson
 The partnerships showed a loss of $31,217.00 for the 1993 year. In addition, the defendant included $24,851.00 in interest income from the investments on his return.
 The defendant also filed a joint 1992 Individual Income Tax Return, Form 1040, which included $34,460.00 in interest income from the investments and a loss of $92,422.00 from the Schedule E real estate partnerships.
 The accountant prepared the figures relating to the partnership income from information provided by Carrozzella. The interest income reported by the defendant was never physically received by him; the figures were reported by Carrozzella to the accountant.
 11. The defendant maintains that, although he was not privy to specific bank or stock brokerage accounts, during the late 1980's, he was generally aware that client money was probably being mingled and used to purchase interests in properties which were listed in his name and/or Carrozzella's name. He also knew there was a stock brokerage account naming him and John Carrozzella as joint tenants. Although he had no specific knowledge that client funds were being invested in his name, he was generally aware that it was probably the case.
 The defendant claims that while he realized that client funds probably were invested in properties in his and/or Carrozzella's name, he originally believed the funds were invested for the beneficial interests of the clients. He maintains that not until 1992 or 1993 did he suspect, and later believe, that clients' funds had been seriously depleted or lost. Before that, it was Richardson's belief that, although not liquid, client funds were available to repay the clients.
 The Government disputes these claims and maintains that the defendant's participation in and knowledge of the fraudulent scheme, including but not limited to the financial losses, dates back to at least 1987.
 12. When Richardson was aware that client funds were being lost, neither he nor John A. Carrozzella disclosed these facts to any of the clients. Rather, until 1995, the defendant Thomas J. Richardson continued to bring to the firm client money which was used in the fraudulent scheme.
CT Page 5292
 13. In order to continue the scheme and artifice to defraud and to conceal the fraudulent activity, the defendant periodically mailed or caused to be mailed letters to all his clients who had entrusted money to him or for whom he held money as a fiduciary or conservator. The letters outlined the amount of the principal held by the defendant and the interest earned. In addition, for some of the clients, an interest check was enclosed.
 From at least as early as 1987 through June 1995, the letters, in fact, misrepresented the status of the investment in that the principal was decreasing or no longer existed because it was used to cover unrelated expenses and/or because it had been lost through poor investments. The defendant maintains that it was not until 1993 or 1994 that he knew the letters were false.
 14. The Government claims that as part of the scheme and artifice to defraud, the defendant Thomas J. Richardson submitted or caused to have submitted false accounts to the Connecticut Probate Court. For example, the defendant was under a statutory obligation as a fiduciary to file accounts on behalf of Clients B and C. The Government maintains that the accounts filed with the Probate Court on behalf of Clients B and C, as well as on behalf of other clients, were false and thus, in violation of judicial process or order. The defendant disputes the Government's claim that the accounts were in violation of a judicial process or order.
 15. For purposes of U.S.S.G. § 1B1.3 (Relevant Conduct), the defendant agrees that not only the victims outlined in the information but other individuals (See Appendix A, filed under seal and made part of the Stipulation of Offense ConductO suffered losses form fraudulent schemes substantially similar to those outlined in the Information and executed by the defendant. The defendant and the Government disagree on the amount of the loss for purposes of computing the guideline range under U.S.S.G. § 2F1.1 and disagree as to whether the losses suffered by all the victims listed on Appendix A are attributable to the defendant for relevant conduct purposes.
 16. Based on the computer records maintained at the direction of and voluntarily produced to the Government by John A. Carrozzella, the Government maintains that the amount of money owed to all clients is $12,474,017.44. It is the CT Page 5293 Government's position that this is the figure which should be used to determine loss under the United States Sentencing Guidelines. As noted, the defendant contends that the loss figure for purposes of computing his guideline range is lower.
 The defendant Thomas J. Richardson claims that he was not an active participant in the scheme and had no knowledge concerning either the solicitation or use of funds relating to both the clients brought in by John A. Carrozzella and the actual disbursements and management of the funds. Thus, the defendant Thomas J. Richardson claims that, for purpose of computing the loss under the guidelines, he should be held responsible for only the money entrusted directly to him by his clients and by clients handled by both him and John A. Carrozzella, which the Government claims is $1,349,267.68. The defendant maintains the Government's calculation is inaccurate and believes that the figure is approximately $1,000,000.00.
 The Government argue that Richardson participated in a jointly undertaken activity with John A. Carrozzella and others and that other criminal acts were reasonably foreseeable to him. Therefore, the defendant should be responsible for the full amount under U.S.S.G. § 1B1.3.
A presentment proceeding "is neither a civil action nor a criminal proceeding, but s a proceeding sui generis, the object of which is not the punishment of the offender, but the protection of the court." Statewide Grievance Committee v.Rozbicki, 219 Conn. 473, 483 (1991), cert. denied, 502 U.S. 1094,112 S.Ct. 1170, 117 L.Ed.2d 416 (1992). The function of the grievance committee is to initiate presentment and thereafter a de novo evidentiary proceeding is carried out by the court, with whom rests the ultimate responsibility to determine whether an act or acts of misconduct occurred. Statewide Grievance Committeev. Presnick, supra, 215 Conn. 167. "In presentment proceedings, the Statewide Grievance Committee must prove by clear and convincing evidence that the attorney misconduct it alleges has occurred." Statewide Grievance Committee v. Whitney,227 Conn. 829, 838 (1993). In this case, Richardson's conviction itself is proof of his misconduct. Moreover, Richardson has acknowledged his wrongdoing in this proceeding.
Practice Book Sec. 2-41 then requires the reviewing court to determine "the extent of the final discipline to be CT Page 5294 imposed. . . ." The "paramount importance in attorney disciplinary matters is the protection of the court, the profession of the law and of the public against offenses of attorneys which involve their character, integrity and professional standing." Statewide Grievance Committee v. Shluger,230 Conn. 668, 681 (1994). "Courts are, as they should be, left free to act as may in each case seem best in this matter of most important concern to them and to the administration of justice."In re Peck, 88 Conn. 447, 457 (1914).
While not adopted by the judges of this state, the American Bar Association has adopted Standards for Imposing Lawyer Sanctions which utilize, inter alia, a system for comparing aggravating and mitigating factors. In Statewide GrievanceCommittee v. Shluger, supra, 230 Conn. 673, f. 10, the court set forth the factors and ultimately reviewed and upheld the trial court's decision based on those factors. Id., 679-680.
Mitigating factors in Richardson's favor include the absence of a prior disciplinary record, his plea of guilty and his apparent remorse. His alcoholism is also a factor, and his efforts to combat this disease and to work on his recovery are to be applauded. He is also to be commended for his cooperation with the government in the investigation and prosecution of Carrozzella. These factors, however, must be balanced against the enormity of the fraud in which he was a significant participant.
There is no question that it was Attorney Carrozzella and not Attorney Richardson who was the prime mover behind this nefarious scheme. Indeed, Attorney Carrozzella also entered guilty pleas in federal court and is still serving a lengthy prison sentence. On June 30, 1995, he voluntarily agreed to resign from the Bar and waived the privilege of applying for reinstatement. By his own admission however, Richardson's own actions resulted in the loss of at least $1,000,000.00 to his clients.
At the hearing conducted in this matter on March 13, 1998, the respondent offered the testimony of Ernest Corriveau, who was one of the victims of the Carrozzella Law Firm's fraudulent activities. Despite having lost at least forty thousand dollars, Corriveau spoke highly of Richardson and attributed his downfall more to Richardson's alcoholism than to any willful intent to defraud him and others. He also presented several letters of support from family, friends, former clients and other attorneys as well as documentation of his treatment for alcoholism. CT Page 5295
In his own testimony, Richardson acknowledged that he was an alcoholic and that his drinking had caused him significant problems during the course of his law practice. Indeed, although he had been Carrozzella's partner for many years, in 1990 Carrozzella terminated that relationship because of Richardson's drinking and made him an employee of the firm. Partly as a result of this move, Richardson had even less contact than before with the books of the firm and, receiving thereafter only a flat salary of one thousand dollars per week, was not keeping track of how clients' money was being managed.
By around 1993, however, Richardson was well aware of what Carrozzella had been doing and that the firm's clients had suffered massive losses as a result of Carrozzella's activities. Yet he continued to encourage clients to invest their money with Carrozzella. It was not until June of 1995 that he approached federal authorities and agreed to cooperate in the prosecution of Carrozzella. Despite the mitigating factors outlined above, it is obvious that Richardson is not free from blame, a fact reflected in his conviction and substantial term of incarceration, notwithstanding his cooperation with federal authorities.
Richardson's counsel has eloquently argued for this court to impose discipline short of disbarment. When, however, in the course of his testimony, this court asked Richardson what he thought the sanction should be for someone who had done what he did, Richardson paused only for a few seconds before candidly replying, "I think that someone who mishandles client's funds should not be allowed to practice law."
It took a great deal of courage and insight for Richardson to make this acknowledgment in open court, as well as to reveal details of his alcoholism and private life. As much as this court would like to reward his candor, however, the court agrees with his assessment of the nature of the discipline that must be imposed in a case of this magnitude. No discipline short of disbarment would be an adequate response to the respondent's conduct.
Unless otherwise specified, disbarment carries with it the opportunity to apply for reinstatement at some future date. SeeIn Re Application of Morton J. Dimenstein, 36 Conn. Sup. 41
(1979). Reinstatement, of course, is not automatic and will be a privilege that Richardson will have to earn. Based on the CT Page 5296 materials presented to it, this court believes that Richardson is capable of earning that right and hopes that he does so. Based on the present state of the record, however, this court feels that it has no alternative but to enter an order of disbarment.
It is therefore the judgment of the court that the Respondent be disbarred, effective immediately.
Jonathan E. Silbert, Judge